**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ROBERT C. BAUCOM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 06-0785-WS-B** |
| | ) | |
| **SISCO STEVEDORING, LLC,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter came before the Court for non-jury trial on February 12 and 13, 2008. Both sides called witnesses and introduced exhibits (including deposition transcripts) into evidence. The record is now closed. At the conclusion of trial, the Court ordered post-trial briefing on certain enumerated factual and legal questions. That briefing having been completed, the undersigned now enters findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

**I.      Overview of Claims Presented.**

Plaintiff Robert Baucom brought this action against defendants Sisco Stevedoring, LLC ("Sisco") and PM Marine Employee Management, Inc. d/b/a Pinnacle Marine Services ("Pinnacle") as a result of injuries he sustained on December 8, 2003 while working for Pinnacle on a crane barge owned and operated by Sisco. Plaintiff brings claims against defendants for negligence under the Jones Act, for unseaworthiness of the vessel, and for exemplary damages and attorney's fees arising from Sisco/Pinnacle's failure to pay maintenance and cure.[1] Sisco and Pinnacle deny liability, and further assert that any award to Baucom must be reduced

---

[1]      The parties' Joint Pretrial Document (doc. 112) frames a much more expansive maintenance and cure claim. In post-trial briefing, however, plaintiff conceded that "there are no claims for maintenance and cure currently pending against Sisco/Pinnacle except the claims for exemplary damages and attorney fees for failure to pay maintenance and cure." (Plaintiff's Post Trial Brief (doc. 145), at 2.) The Court therefore does not have occasion to examine any dimension of this claim other than the request for exemplary damages and fees relating to Sisco/Pinnacle's failure to pay maintenance and cure benefits after October 2006.

proportionately by his share of fault, pursuant to comparative negligence principles.

**II.     Findings of Fact.**[2]

    *A.     The SISCO I.*

On December 8, 2003, Baucom was employed as a crane operator aboard the SISCO I, a crane barge that was moored at the Mobile River Terminal and engaged in operations of loading and unloading cargo from other vessels.  The SISCO I was owned and operated by Sisco; however, Pinnacle performed payroll management services for Sisco, and nominally employed Baucom and the other SISCO I crew members.

The SISCO I has a 120-foot long crane boom equipped with a catwalk and handrails to allow crew members a safe means of traversing and inspecting the boom.  The handrails, which at all relevant times were 3/8" solid round rods, warp, bend and ultimately break from time to time because the boom flexes during ordinary crane operations.  That flexing motion may cause the handrail to break loose at the joint where it is welded to a vertical bar.[3]  Whenever a handrail broke loose on the SISCO I, Sisco supervisor Henry Aaron Elliott's practice was to contact a company called Corley Construction, which would dispatch certified welders to repair the rail.[4]

---

[2]    The Court's review of the evidence in this case has been unnecessarily complicated by several factors.  First, both parties have overburdened the record with hundreds of pages of exhibits that were never referenced in trial and that had, at best, tangential bearing on the issues joined for trial.  This should not have been a document-intensive case, yet the parties made it so.  As the Court repeatedly cautioned the parties at trial, documents in evidence that the parties never cited or explained the significance of during trial or in post-trial briefing will not be considered.  Therefore, the Court has waded through hundreds of pages of uncited evidentiary clutter to focus on the specific pages referenced in trial testimony or post-trial briefing.  Second, the parties have inexplicably duplicated numerous exhibits, with both plaintiff and defendants offering into evidence copies of the same medical records, the same deposition transcripts, the same photographs, and the same tax returns.  Such redundancy serves no constructive purpose and results in needless expenditure of judicial resources to sift through the parties' overlapping submissions for the documents of interest.

[3]    There was testimony that the risk of broken handrails could have been avoided if the handrails had been replaced with so-called "wire rope" instead.  Although that option was available, Sisco elected not to replace the rigid handrails with flexible cables that could have served the same functional purpose without the accompanying safety risks.

[4]    Corley Construction billing records reflect that it welded broken handrails on the SISCO I on July 22, 2003 and again on April 1, 2004; however, those records do not reflect that

That said, Sisco/Pinnacle employees (who were not certified welders) would sometimes perform welding work on the SISCO I, and there was a welding machine onboard and accessible to all crew members that could be used to repair welds on an as-needed basis, although Elliott denied that SISCO I crew members would ever make spot welds on the boom.  Elliott acknowledged that a broken handrail would present an unsafe condition, that the crane could not function if one of its cables became wrapped around a broken handrail on the boom, and that it would not be safe to operate the crane if one of its cables became wrapped around a broken handrail.  A properly functioning crane is essential to SISCO I's mission of loading and unloading cargo, and a crane cable being tangled in a broken handrail would render the vessel unfit to perform that fundamental mission.[5]  Because of expensive demurrage costs if the SISCO I is taken out of service during the course of loading or unloading a ship, Sisco endeavors to schedule maintenance and repair on the vessel only during times when it is not otherwise operating.  In light of these severe financial consequences, Elliott would not take the SISCO I out of service in the middle of a job if a handrail broke, but would instead simply bend the broken rail out of the way by hand until such time as the job was completed and proper repairs could be performed.  However, plaintiff's expert testified that simply bending a broken handrail out of the way (even assuming it was physically possible to do so) may not correct the problem because a broken rail

this company repaired any handrails on the SISCO I at or around the time of Baucom's accident on December 8, 2003.  This is so, even though Corley Construction did work on the SISCO I from December 1-3, 2003, just days before the accident.  Moreover, it is clear from the record that if repairs were done on the broken handrail onboard the SISCO I shortly after the accident, those repairs were not performed by Corley Construction.  In that regard, Corley Construction performed welding tasks on the SISCO I on December 26-27, 2003, less than three weeks after the accident, but did not repair any handrails at that time.

[5]      Elliott's testimony on these points was reinforced by that of Robert Borison, plaintiff's expert in crane safety and crane operations.  Borison concurred with Elliott's opinions that a crane cable wrapped around a broken handrail would be unsafe and would render the crane barge unfit to perform its function of unloading vessels.  Borison further testified that replacing the solid handrails with flexible cables looped through the vertical bars would have reduced the risk of breakage of those handrails.

is like a spring, such that it would likely not remain in the position where it was bent back.[6]

With respect to the SISCO I's history of broken handrails and related crane problems, the Court credits the testimony of Dale Allemand, a crane operator who worked aboard the SISCO I periodically, including during the first half of 2003 as well as in January 2004. Allemand testified that a handrail on the crane boom of the SISCO I was broken and bent at various times in 2003 and early 2004, and that on at least two occasions during that time period a crane cable jumped and became entangled in the broken rail, rendering it extremely difficult for Allemand to free the heavy cable and resume crane operations. Allemand reported both the broken handrail and the fact that crane cables had gotten hung up in that broken rail to his supervisors at Sisco; however, the broken handrail was never fixed prior to the conclusion of his employment with Sisco/Pinnacle in January 2004. Thus, the SISCO I was experiencing recurring problems in 2003 and 2004 with crane boom handrails breaking and crane cables becoming entangled. What's more, Sisco/Pinnacle had actual notice of these incidents, but failed to take corrective action.

**B.      The Events of December 8, 2003.**

On the morning of December 8, 2003, the SISCO I was scheduled to commence unloading cargo from a vessel called the NORTHERN FRIENDSHIP. Prior to beginning the job that morning, Sisco deck hands changed out a worn closing line cable on the crane, a routine procedure that takes approximately two hours. The process of changing the cable delayed the start time of the SISCO I's cargo unloading duties that day. At approximately 11:45 a.m., the SISCO I began unloading cargo from the NORTHERN FRIENDSHIP.

Baucom, a certified crane operator with eight years (at that time) of experience operating derrick cranes such as that on the SISCO I, was on duty working the 6 a.m. to noon shift, as well as the 6 p.m. to midnight shift.[7] As second crane operator on the SISCO I, Baucom was

_____

[6]      In light of this testimony, the Court does not accept defendants' suggestion that bending the broken rail out of the way was a viable solution to the problem that existed at the time of Baucom's accident.

[7]      At any given time when the SISCO I was working, two crane operators were assigned to the vessel. Those operators would work alternating six-hour shifts on a round-the-clock basis, and would rest in crew quarters onboard the vessel during their off-duty time.

responsible for inspecting the top of the crane during each shift, including the boom and catwalk areas, and for reporting any observed damage to the lead operator (Troy Hayes) or to Elliott.[8]  In accordance with these duties, Baucom walked out on the catwalk to inspect the crane boom every 12 hours each day that he was working onboard the SISCO I.  On the morning in question, Baucom walked the catwalk and inspected the boom.  At that time, he observed a broken middle handrail on the crane boom, with the rail bent in toward the center of the boom at an angle of approximately 30 degrees, and bent upward at an angle of 15 to 20 degrees.  Baucom had previously reported the broken handrail to Sisco.  Indeed, this was not the first time that Baucom had observed that handrail to be broken or reported it to his supervisor; to the contrary, the rail had been broken for a period of at least a week (and perhaps even several weeks), and he had reported it to Hayes several times prior to December 8, 2003.[9]  However, Sisco/Pinnacle had not remedied the problem.  Baucom did not believe that the broken handrail would interfere with the operation of the crane at that time, and he did not undertake to push the handrail backwards because he did not think the cable could jump in behind the rail in its current position.

    In connection with the cable being changed, the crane was boomed down to zero, meaning that the tip of the boom was actually touching the ground on shore, enabling the deckhands (also on shore) to replace the cable.  After the cable-changing process was complete, at approximately 11:15 a.m. or 11:30 a.m., Baucom began to boom the crane up in preparation to bring the SISCO I alongside its client vessel and commence the cargo unloading process.  When the boom reached approximately a 60-degree angle, the slack in one of the cables (either the holding or closing cable, depending on which witness's testimony is believed) allowed it to backlash behind the broken handrail, resulting in this 1 5/8" steel cable being wrapped behind

_____

[8]    In addition to reports of damage being required by Sisco policy, plaintiff's own crane safety expert testified that he would expect any crane operator to report broken rails to supervisors promptly, and for the problem to be repaired by the company that very day, rather than weeks or months later.

[9]    Baucom's testimony in this regard was unrebutted.  Even though Hayes appeared and testified at trial, defendants never asked him whether Baucom had reported the broken handrail to him on multiple occasions prior to December 8, 2003.  The Court therefore credits Baucom's testimony that he in fact did report the defective condition to Hayes repeatedly prior to the date of the accident in accordance with Sisco policy, and that Hayes did nothing about it.

the handrail. Baucom observed this condition and feared that continuing to operate the crane in those circumstances could cause the rail to snap off altogether, creating a hazard for people on the ground or for Baucom himself in the crane cab. Not wanting to damage the crane or to jeopardize the safety of his co-workers, Baucom boomed the crane back down, walked out on the catwalk, and used his foot to kick the cable (which was twisted around the broken handrail) off the end of the rail.[10] The problem was that now the cable was behind the rail, such that if Baucom had raised the boom at that time, the cable still would have been obstructed by the broken rail. To free the cable, Baucom grabbed the cable physically with both hands and pulled on it. Eventually the cable came loose; however, when it did so, the cable violently pulled Baucom down to his knees on the catwalk.[11]

A deckhand, Gene Laskey, witnessed the accident from 30 feet away, and corroborated Baucom's account. The accident happened shortly after Laskey and three other deckhands (who were standing on the beach) changed the closing cable, when the crane boom was laid down to the ground. Laskey specifically observed the broken handrail, and saw Baucom grappling with

---

[10]     Baucom did not attempt to utilize the levers and pedals in the crane cab to loosen the cable because, in his judgment, the cable was tangled around the handrail in such a manner that using levers and pedals would be more likely to tighten the handrail and snap it off completely than to successfully free the cable. Baucom did not radio others aboard the SISCO I for assistance in loosening the cable from the rail because he did not believe he needed help to perform this task.

[11]     At trial, defendant suggested that Baucom had fabricated this account and that there had been no accident on board the SISCO I that day. In furtherance of this argument, defendant repeatedly suggested that Baucom's trial testimony concerning the accident's occurrence and details deviated from his prior statements given in depositions or medical examining rooms. The Court has examined the allegedly contradictory deposition transcripts and medical records, and finds no material inconsistencies between Baucom's trial testimony and his prior statements concerning the manner in which he was injured on December 8, 2003. For example, defendant made much of Baucom's statements to doctors that he hurt his back while changing a cable or pulling on a cable, rather than freeing a cable that had become entangled in a broken handrail. The Court perceives no incongruity between the two categories of statements because (a) Baucom's trial testimony was clear that the injury happened at the end of the cable-changing process; and (b) his trial testimony was also clear that he pulled on the cable in an attempt to free it from the broken handrail. Just because Baucom's medical providers may not have written the term "broken handrail" in their records of his description of the accident does not render his trial testimony suspect in any respect.

and pulling on the cable in an attempt to free it.  Laskey further observed Baucom as the cable
"snatched him down" to his knees on the deck when it finally came loose from the broken rail.
No one from Sisco ever interviewed Laskey in connection with the investigation, and Laskey
never volunteered that information to any Sisco supervisors because he did not realize until
much later that the incident he observed had caused Baucom's injuries.[12]

After being snatched down by the cable, Baucom knew immediately that his back was
hurt, but initially thought that it was merely a muscle strain.  For that reason, he continued
working until shift change at approximately 12:00 p.m.  When Baucom's shift ended, he reported
the incident to Hayes, then endeavored to rest in crew quarters onboard the SISCO I until his
6:00 p.m. shift.  Because of the significant back pain he was enduring, however, Baucom was
unable to sleep.  Nonetheless, Baucom tried to work his next shift, even though he had informed
Hayes (the lead operator) that he had injured his back during the previous shift.  In climbing the
25-foot ladder from the engine room to the crane operator cab, Baucom felt a pop in his back.
He proceeded to operate the crane for approximately 5 minutes in his 6:00 p.m. shift before
realizing that his back pain was simply too excruciating to allow him to continue working.

SISCO I crew members (presumably Hayes) called Elliott at his home at approximately
7:30 p.m. to inform him that Baucom had hurt his back and needed to go to the hospital.  Elliott
promptly drove to the Mobile River Terminal, arranged for Baucom to be transported by tugboat
back to the bulkhead, and then drove Baucom to the Springhill Memorial Hospital emergency
room in Elliott's personal vehicle.  Elliott observed that Baucom was in obvious pain.

---

[12]     Defendants sought to discredit Laskey's eyewitness account by suggesting that he
could not have seen the rail and cable from his position on the beach.  However, there is no
evidence before the Court that the photographs that defendants submitted in support of this
proposition accurately depicted the position of the crane and the perspective of Laskey at the
time of the accident; to the contrary, those photographs are inconsistent with Laskey's testimony
as to his angle of observation and with Elliott's testimony as to the position of the boom when a
cable is being changed.  Similarly, defendant's attempt to challenge Laskey's testimony on the
basis that he wears prescription eyeglasses today but did not do so in 2003 is unavailing without
some evidentiary basis for believing that Laskey's vision was impaired or that he required
corrective lenses on the date in question.  More generally, the Court concludes that Laskey is a
disinterested, neutral witness whose testimony concerning his observations on the morning of
December 8, 2003 is highly credible.

Unfortunately, Sisco/Pinnacle's investigation of the accident was woefully inadequate. No written statements were taken from Baucom or any of the remaining SISCO I crew members (which consisted of four deckhands and one other crane operator) to confirm what, if anything, they saw or what happened. Although Elliott testified that he asked the deckhands whether they witnessed Baucom's accident, the Court credits deckhand Gene Laskey's testimony that neither Elliott nor anyone else inquired as to whether he saw the injury occur. No contemporaneous photographs of the crane boom or handrails were taken. Elliott himself did not personally inspect the boom of the crane until several days after the fact. At that time, he testified, he did not observe any broken handrails. Even if Elliott's testimony is accurate, though, it is impossible to know whether the condition of the rail had been altered by SISCO I crew members or a third party during the intervening time period. And even when he did conduct that inspection, Elliott neglected to take photographs that might corroborate his testimony as to what he saw or did not see, or that might allow an expert to assess the existence or recency of any welding repairs to the handrail in question.[13]

### C.    Plaintiff's Work History following the December 2003 Accident.

Baucom was out of work for medical reasons for approximately five months after the December 2003 accident. He did not work at all until he received a medical release on May 19,

_____

[13]    To be sure, Elliott testified that Hayes had walked the boom the evening of Baucom's accident and had not seen anything amiss with the handrails. Inexplicably, however, defendants neglected to elicit testimony from Hayes to that effect while Hayes was on the witness stand. In fact, Hayes testified in plaintiff's case in chief that he did not inspect the handrail after Baucom reported his injury. Thus, defendants would have the Court find that the handrail was not broken on December 8, 2003 based on Elliott's hearsay testimony that Hayes told him he had walked the boom that night and that the handrail was fine. The Court does not credit that testimony, particularly because (a) defendants could have asked Hayes that question, but did not; (b) both Baucom and Laskey testified that they saw the handrail was broken that day; (c) handrail breakage was a fairly common occurrence on the SISCO I, judging by Allemand's testimony and the Corley Construction billing records; and (d) Hayes denied having inspected the handrail. Defendants are correct that there is no direct evidence as to when the broken handrail was repaired; however, there are multiple possibilities. Repairs could have been done by any Sisco employee, given that they all had access to the welding machine onboard the barge. Or Sisco could simply have allowed the handrail to remain broken for months, as Allemand and Baucom testified it was wont to do. Either way, the Court expressly finds that the handrail was in fact broken on December 8, 2003. It matters not when or how it was repaired.

2004, after which he promptly returned to work for Sisco/Pinnacle aboard the SISCO I.[14]
Baucom was taking prescription medication (anti-inflammatories) and non-prescription pain
relievers (such as Aleve) at that time.  Even though he had resumed full-time work as a crane
operator aboard the SISCO I, and even though his physicians had released him to return to work,
Baucom continued to experience intermittent lower back pain, numbness in his right foot,
occasional sharp pain radiating down his buttocks, and other forms of continuing discomfort.
The more physically active Baucom was, the more intense his pain was.

Sisco/Pinnacle terminated Baucom's employment in approximately September 2004
because he had damaged several ships during normal crane operations, as a result of what Elliott
characterized as a "don't-care attitude."  Following his dismissal, Baucom found suitable
employment working for several different companies as a crane operator on floating derrick
barges in the northeastern United States.  On one of those jobs, in October 2004, Baucom
strained his back while using a pry bar to loosen a crane cable while working for a company
called Atlantic Soundings; however, he missed no time from work as a result of that incident,
sought no medical treatment at that time, and the pain subsided to its previous levels within days
after that incident.  In approximately January 2005, Baucom returned to the Mobile area for
medical and employment-related reasons.

On April 21, 2005, Baucom began employment with Kinder Morgan Bulk Terminals
operating a floating crane in Tampa, Florida.  No medical restrictions had been placed on
Baucom's work activities by his treating physicians at that time.  On his very first day on the job,
Baucom was pulling the slack out of a cable when he felt a pop in his back and experienced a

---

[14]     During the 22-week period that Baucom was out of work following his back
injury, Pinnacle paid him weekly indemnity benefits in the amount of $1,030.78, treating him as
a longshoreman engaged in stevedoring activities, and not a Jones Act seaman.  The unrebutted
evidence is that the level of benefits Baucom would have received under a maintenance and cure
framework for a Jones Act seaman would have been substantially lower than those
longshoreman benefits.  Moreover, it was subsequently concluded, and this Court has explicitly
held in previous rulings in this case, that Baucom is properly classified as a seaman, not a
longshoreman, for purposes of this injury.  Pinnacle relies on these facts as evidence of good
faith, contending that if it had been acting in bad faith it would never have paid Baucom
generous longshoreman benefits when he was entitled only to lesser maintenance and cure
benefits.

shooting and burning pain in his right leg.[15]  Baucom went to the hospital immediately.  Since that time, Baucom has never returned to work, either at Kinder Morgan or anywhere else.[16]

### D.    Plaintiff's Medical Diagnosis and Treatment.

Prior to December 2003, Baucom had complained to his supervisor, Elliott, of discomfort in his arms or elbows; however, he had never experienced any significant back injuries or back pain.  Following the December 2003 accident, Baucom was diagnosed with lumbar back pain, lumbar spine strain, degenerative disc disease, and herniated discs.[17]  Baucom received medical treatment from a pain specialist and orthopedists, with such treatment taking the form of physical therapy, pain medication (including muscle relaxers and lortabs), and lumbar epidural injections in his back.  On April 13, 2004, one of plaintiff's orthopedists, Tim S. Revels, M.D., opined in a clinic note that "no surgery is indicated" for plaintiff's back problems, which Dr. Revels expected "to slowly get better on [their] own."  This appears to be what happened, as plaintiff's subjective complaints diminished over time, even as the underlying objective back condition remained the same.

In May 2004, plaintiff participated in a functional capacity evaluation, which concluded that Baucom had demonstrated the ability to lift in the full heavy physical demand level.  Based on that evaluation, his physicians concluded that Baucom could be released back to full duty in heavy physical demand work as a crane operator with no restrictions.  On May 19, 2004, another of plaintiff's treating orthopedists, Christopher Patton, M.D., stated his opinion that Baucom had reached maximum medical improvement, that he had a 0% impairment, and that he was cleared to return to work regular duty.  Significantly, however, despite the improvement in Baucom's

---

[15]    There is no suggestion in the record that the Kinder Morgan accident did not actually occur or that Baucom was in any way negligent in bringing about that accident.

[16]    Pinnacle did not pay maintenance and cure or other benefits to Baucom after the April 2005 accident at Kinder Morgan because it was relying on a functional capacity evaluation and opinion from Baucom's treating physician that he had reached maximum medical improvement from the December 2003 accident in May 2004, thereby concluding Pinnacle's maintenance and cure obligations.

[17]    The parties have identified no medical evidence or other facts tending to show that Baucom's pre-existing degenerative disc condition had caused him any health problems, significant discomfort, or other adverse symptoms prior to the December 2003 accident.

subjective symptoms and complaints, his underlying anatomical diagnosis was unchanged. Simply put, Baucom's back problem had not gone away, even though he had experienced a diminution in subjective complaints and an amelioration of his symptoms.

Throughout the remainder of 2004 and early 2005, Baucom passed multiple work-related physical examinations, and was cleared in each instance to work as a crane operator without restrictions. However, he continued to require ongoing medical care for his sporadic back problems. In that regard, Baucom revisited Dr. Patton periodically for continuing back stiffness and pain, including clinic visits on January 18, 2005 and April 15, 2005. The catalyst for the latter appointment was a trip to the beach in which Baucom experienced significant lower back pain. Dr. Patton prescribed medication and recommended physical therapy.[18]

On April 21, 2005, just six days after visiting Dr. Patton for back pain after the beach trip, Baucom began working for Kinder Morgan, and re-injured his back in his first day on the job. The subjective symptoms described by Baucom after the Kinder Morgan accident were similar to those after the Sisco accident; however, his pain had worsened in both duration and intensity, and there were additional symptoms such as bladder and bowel dysfunction, as well as a burning pain down the back side of his right leg that Baucom likened to placing a frying pan up against the leg.[19] That said, there were periods of time before the Kinder Morgan accident in which Baucom experienced back pain episodes so debilitating that he was rendered bedridden until they abated. Overall, Baucom's subjective complaints to his treating physicians following the 2005 accident were similar to those he expressed following the 2003 accident, although the

---

[18]     Plaintiff contends that Dr. Revels testified in his 2007 deposition that he would have recommended surgery prior to April 2005 had he known that Baucom was continuing to see Dr. Patton periodically for back pain during the April 2004 - April 2005 period. This argument takes unwarranted liberties with the cited pages of Dr. Revels' deposition, and will not be adopted by this Court.

[19]     It should be noted, however, that medical evidence confirms that Baucom had reported this right-leg pain symptom in early 2004, long before the Kinder Morgan accident. Indeed, a clinic note from Dr. Patton dated March 17, 2004 reflects that Baucom was complaining of "pain shooting all the way down his right leg to his foot," and that he further complained that epidural injections were providing him with scant relief. It would therefore be inaccurate to characterize these symptoms as unique to the post-April 2005 period.

degree, intensity and duration of the pain had increased.

Following the Kinder Morgan accident, Baucom was treated by Russell A. Hudgens, M.D., who diagnosed the injury as a herniated disc in the lumbar spine and aggravation of pre-existing injury, for which he prescribed a regimen of physical therapy, medication, and epidural injections. Dr. Hudgens placed Baucom on a "no work duty" status. The epidural injections provided negligible relief for plaintiff, and Baucom continued to suffer leg and back pain throughout the remainder of 2005, with numerous doctor's visits during that span. In September 2005, Baucom was referred back to Dr. Revels (an orthopedic surgeon specializing in spinal surgery who had been one of his treating physicians after the December 2003 injury) for a consultation. Dr. Revels concluded that the 2005 incident had aggravated the symptoms Baucom was already experiencing from the 2003 incident, such that he was now being treated for an aggravation of a pre-existing problem, not a new problem altogether.[20] Dr. Revels' testimony was clear that no new objective injury was caused by the April 2005 accident. The principal difference from Dr. Revels' standpoint was that, rather than waxing and waning as they had previously, Baucom's symptoms were now persistent and constant, and his subjective complaints were worse than they had been.

On April 12, 2006, Dr. Revels determined that conservative treatment measures had failed and recommended that Baucom undergo a two-level lumbar fusion surgery. The goal of this surgery would be to attempt to correct the herniated disc that was causing Baucom's pain and to restore him to a higher level of functionality. Dr. Revels testified that there is no way to know whether Baucom would have required the lumbar fusion surgery had the April 2005 aggravation of the December 2003 injury not occurred, but that it is possible that he would

---

[20] This opinion was prompted in part by a comparison of results of MRIs, one of which was done shortly after the December 2003 accident and the other of which was done shortly after the April 2005 accident. The physicians observed no significant differences in the MRI results, as the abnormality at the L4-5 level that was the biggest objective cause of plaintiff's discomfort was exactly the same on both films. Indeed, Dr. Revels found only minimal changes in one of the subject disc fragments. Furthermore, the symptom complexes that Baucom was reporting after the December 2003 accident were largely the same as those he was reporting after the April 2005 accident. Dr. Revels testified that it was not unusual for a patient with Baucom's symptoms to experience pain levels that waxed and waned over time.

have.[21]  However, Dr. Revels also testified to a reasonable degree of medical certainty that the surgery he was recommending for Baucom was related to the 2003 accident and not the 2005 accident.[22]  Even though Dr. Revels had reached the conclusion in April 2006 that Baucom was a good candidate for lumbar fusion surgery because of the December 2003 accident, his deposition of October 2006 marked the first time that this surgery recommendation was communicated to Sisco/Pinnacle.

Baucom did not undergo that surgical procedure at that time because he could not afford the $82,000 price tag, and neither Sisco/Pinnacle nor Kinder Morgan would agree to foot the bill. As of January 18, 2008, the last time plaintiff saw Dr. Revels, the treatment recommendation for surgery was unchanged.  Baucom has been willing and ready to proceed with surgery for some time, pending funding.  That funding has now been secured by virtue of a settlement entered into between Baucom and Kinder Morgan shortly before trial in this case, pursuant to which Kinder Morgan agreed to pay maintenance and cure benefits to Baucom, including specifically paying for the surgery.  This presumably will be scheduled in the near future, although plaintiff offered no evidence to that effect and no explanation for the delay in scheduling the surgery following the Kinder Morgan settlement in January 2008.  Dr. Revels, the physician who will perform the

---

[21]     The Court notes that Plaintiff's Exhibit 17 is a copy of the complete transcript of Dr. Revels' deposition of October 26, 2006.  That transcript was admitted into evidence at trial. Unfortunately, this document is marred by numerous highlighting marks and notations, all of which the Court has disregarded.  The same is true of Plaintiff's Exhibit 20.  To avoid these concerns, counsel should exercise caution to submit clean, unmarked copies of exhibits as evidence at trial.

[22]     The critical testimony is as follows:

"Q:     ... In your opinion, is it more likely than not, with a medical degree of certainty, that the need for surgery that you have recommended for Mr. Baucom is related to his 2003 accident and not related to the 2005 accident?
"A:     Yes."

(Plaintiff's Exh. 17 (Oct. 2006 Dep.), at 10.)  In light of this and similar testimony in Dr. Revels' two deposition transcripts in the record, defendants' characterization of the medical testimony as reflecting "a mere 'possibility' of the relationship between the current back surgery recommendations and the prior 2003 accident" (doc. 146, at 9) is both misleading and demonstrably inaccurate.

-13-

surgical procedure, has no opinion as to whether the delay in performing the procedure while sorting out these economic issues has likely caused Baucom harm or in any way jeopardized the likelihood of a successful outcome.[23] Dr. Revels also testified that he does not know at this time whether Baucom would or would not be able to return to a crane operator position if he underwent the contemplated surgery.

At the present time, Baucom remains unable to work for an indefinite period of time, per physician's orders. Baucom endures substantial back pain on a daily basis, and that back pain intensifies as his level of activity increases. Additionally, Baucom is subject to periodic "episodes" where the back pain becomes so severe that he is completely incapacitated until the pain subsides.

### E.    *Future Earnings Capacity / Lost Wages Evidence.*[24]

Plaintiff's vocational rehabilitation expert, James Miller, opined that Baucom is not presently employable and will not be until such time as Dr. Revels removes his "no work duty" status, which appears likely to remain indefinitely pending the outcome of lumbar fusion surgery to be performed at some unknown date. Miller testified that any projections about Baucom's future wage-earning capacity are necessarily speculative given the broad range of possible outcomes from that surgery, ranging from permanent and total disability to unrestricted work duty. Defendants' vocational rehabilitation expert, Larry Stokes, concurred with Miller that

---

[23]    Baucom testified at trial that Dr. Revels has told him that the operation has a 60% chance of success; however, that hearsay testimony is not corroborated by Dr. Revels' deposition testimony or the medical documentation. Given Dr. Revels' testimony that he has no opinion as to whether Baucom will be able to return to work as a crane operator, the Court adopts the reasonable inference that he has no opinion as to whether the surgery will succeed or not. After all, a sure sign of successful surgery would be Baucom's ability to return to his previous occupation. If Dr. Revels has no opinion as to the likelihood of that outcome, then logic dictates that he has no opinion as to the likelihood of a successful surgery. For that reason, the 60/40 prognosis for success that Baucom attributed to Dr. Revels via hearsay testimony will not be credited.

[24]    In addition to future lost wages, plaintiff is claiming past lost wages of $117,588 for the period of April 2005 through the date of trial, as calculated by his economist, G. Randolph Rice, Ph.D. Defendants' expert calculates a back wages figure some $19,000 lower than that proffered by plaintiff's expert.

-14-

Baucom is medically unable to work at this time, and that his present earnings capacity is zero. However, Stokes made certain assumptions to project that Baucom may be able to return to work at the light level following surgery, and further assumed that he might be able to perform work with a medium level of physical demand.  In reliance on those assumptions, Stokes opined that work would be available for Baucom that would allow him to resume working after surgery with a good vocational prognosis.  However, Stokes agreed that Baucom's earnings capacity prior to his injuries exceeded $1,000 per week, and that other potential jobs identified by Stokes (based on Baucom's past work and alternate jobs) would pay a mere fraction of that amount for full-time employment.

Additionally, defendants offered the expert testimony of economist Kenneth J. Boudreaux, Ph.D., for the proposition that to project Baucom's future lost wages, calculated across his remaining work life expectancy on an after-tax basis and reduced to present value, one need only take the annual difference in Baucom's wage earning capacity and multiply that number by 10.57.  Dr. Boudreaux and plaintiff's economist, Randolph Rice, Ph.D., provided generally similar lost wage calculations, but disagreed as to the wage base that should be used in those calculations (*i.e.*, the amount the Baucom was earning prior to his injuries).  Dr. Boudreaux calculated Baucom's average annual earnings before the SISCO I injury (on a before-tax, after-expense basis) at $44,788, while Dr. Rice pegged the figure at $61,573.  After review of both experts' reports and testimony, the Court finds that Dr. Boudreaux's methodology more accurately captures Baucom's highly variable base wages by examining a longer time frame of income history than Dr. Rice did, and also by taking into account Baucom's proclivity (even in the absence of any injuries or work restrictions) to take several months off from work each year to devote to fishing, hunting and other hobbies.  Therefore, to the extent necessary for any lost earnings calculations, the Court will adopt Dr. Boudreaux's wage base calculations of $44,788 per year as a starting point for any award.

III.    **Conclusions of Law.**[25]

---

[25]    In an Order (doc. 138) entered on February 14, 2008, the undersigned directed the parties to submit post-trial briefs addressing certain enumerated issues.  In that Order, the Court wrote that "the parties are **ordered** to consult with each other in good faith to determine whether stipulations may be reached as to any aspect of any of these legal issues," with any such

The only legal claims presented in this case are as follows: (a) whether plaintiff is entitled to recover from Sisco/Pinnacle on a theory of Jones Act negligence; (b) whether plaintiff is entitled to recover from Sisco on a theory of unseaworthiness; and (c) whether plaintiff is entitled to recover exemplary damages and attorney's fees based on Sisco/Pinnacle's failure timely to pay for his back surgery, pursuant to its maintenance and cure obligations. Each of these claims will be considered in turn, followed by a discussion of pertinent damages issues.

### A.      Jones Act Cause of Action.

"The Jones Act allows an injured seaman to sue his employer for personal injuries suffered as a result of the employer's negligence." *Park v. Stockstill Boat Rentals, Inc.*, 492 F.3d 600, 602-03 (5th Cir. 2007). To establish negligence under the Jones Act, "a plaintiff must show that her employer failed to provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known and that such failure caused the plaintiff's injuries and damages." *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 383 (6th Cir. 2008) (citation omitted); *see also Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1543 (11th Cir. 1989) (similar); *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 437 (4th Cir. 1999) (recovery under Jones Act requires showing of "the breach of a duty to protect against foreseeable risks of harm"). Thus, the critical elements that Baucom must show to prevail on his Jones Act negligence claim are that Sisco/Pinnacle failed to provide a safe workplace by neglecting to eliminate obvious dangers of which they knew or should have known; that Baucom sustained injuries; and that the dangerous condition caused Baucom's

───────────────

stipulations to be filed on or before March 14, 2008. Based on plaintiff's uncontroverted showing, the Court harbors substantial doubts as to whether defendants materially complied with the good-faith consultation requirement. Defense counsel did not even respond to plaintiff's proposed stipulation until after the close of business on the deadline for compliance, and even then failed to offer any principled reason for refusing to assent to that stipulation. (To the contrary, defendants' post-trial brief filed three weeks after the stipulation deadline essentially adopted plaintiff's stipulation as to whether Pinnacle or Sisco or both would be the proper defendants for each of plaintiff's claims.) Nothing in the February 14 Order authorized defense counsel to opt out of the good-faith consultation requirement, yet that is effectively what they did. Moreover, side-by-side comparison of the two post-trial briefs reveals other areas of general agreement that could and should have been the subject of stipulations, but were not. Such disregard of the February 14 Order is disappointing, to say the least, and needlessly complicates the Court's findings and conclusions under Rule 52(a).

injuries.[26]  Each element is satisfied here.

Plaintiff has established by a preponderance of the evidence that defendants negligently failed to cure an obvious, foreseeable danger onboard the SISCO I.  This determination is informed by the following salient facts: (a) there was a broken handrail on the SISCO I's crane boom on the morning of December 8, 2003; (b) that handrail had been broken for at least a week, and perhaps as long as three weeks; (c) Baucom had reported that condition to the lead operator (Hayes) on multiple occasions, but Sisco/Pinnacle had failed to remedy the problem; (d) SISCO I crew members relied on the handrails to traverse the catwalk safely, and a broken handrail created a tripping hazard; (e) a broken handrail created a risk that the crane cables would become entangled in the rail, jeopardizing the safe operation of the crane and raising a likelihood that the cable might snap the rail off altogether, transforming the rail into a dangerous projectile; and (f) crane cables had become wrapped around broken handrails onboard the SISCO I on at least one and as many as two previous occasions in 2003, and that condition had been reported to supervisors by Dale Allemand, such that defendants were aware of the danger.  Taken in the aggregate, these facts satisfy Baucom's burden of showing negligence.  A broken handrail was an obvious danger.[27]  Crew members walking the catwalk might trip over it.  Crane cables might get caught in it, as had happened before.  Defendants' supervisors knew about this obvious danger, because Baucom had reported it to them.  Yet defendants did nothing to correct the problem prior to the accident, even though it would have been a simple matter to weld the

---

[26]     Of course, the Jones Act claim also requires threshold determinations that the SISCO I was a vessel and that Baucom was a seaman.  *See, e.g., Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295, 298 (5th Cir. 2008) ("The Jones Act permits a 'seaman' to sue his employer for personal injuries suffered as a result of the employer's negligence."); *Holmes v. Atlantic Sounding Co.*, 437 F.3d 441, 446 (5th Cir. 2006) ("The existence of a vessel is a fundamental prerequisite to Jones Act jurisdiction ....").  Defendants have previously challenged both of these elements.  By Order (doc. 130) entered on February 1, 2008, the Court concluded as a matter of law that the SISCO I is a vessel for Jones Act purposes and that Baucom is a seaman for Jones Act purposes; therefore, these threshold legal hurdles will not be addressed further herein.

[27]     Pinnacle/Sisco supervisor Aaron Elliott confirmed this fact by answering affirmatively when asked at trial whether he agreed that a broken handrail would present an unsafe working condition.

handrail back onto the boom, as defendants' contractor had done repeatedly.  This constellation of facts establishes negligence for Jones Act purposes.

With respect to causation, a Jones Act plaintiff need only meet a reduced standard of showing that the employer's negligence is the cause, in whole or in part, of his injuries.  *See Taylor*, 517 F.3d at 383; *Dempsey*, 876 F.2d at 1542 ("the courts have allowed a seaman to recover on a Jones Act claim with a lower showing of proximate cause than would be required in a non-admiralty case"); *McClow v. Warrior & Gulf Nav. Co.*, 842 F.2d 1250, 1251 (11th Cir. 1988) (recognizing that in Jones Act cases, "causation may be found if the defendant's acts or omissions played any part, no matter how small, in bringing about the injury") (citation omitted).  There can be no reasonable debate that this "featherweight" causation standard is satisfied here.  Both the medical evidence and Baucom's testimony about the onset of his complex of symptoms reflect that the lower back pain from which he has suffered for the last four-plus years was caused, in whole or in part, by the December 8, 2003 accident.  And that accident in turn was caused, in whole or in part, by defendants' negligence in failing to repair the obviously dangerous condition of the broken handrail aboard the SISCO I.  Had defendants repaired the handrail promptly when Baucom brought it to their attention at least days before the accident, the crane cable could not have become tangled in the rail on the morning of December 8, 2003, Baucom would not have had to attempt to free the cable, and he would not have been jerked to his knees on the deck when the cable finally became free.  There is thus abundant record evidence to support the Court's conclusion that the requisite causation for Jones Act liability is present here.

In post-trial briefs, both Baucom and Sisco/Pinnacle concur that Sisco and Pinnacle may be held jointly liable on plaintiff's Jones Act cause of action.  (*See* Plaintiff's Brief (doc. 145), at 2-3; Defendants' Brief (doc. 146), at 1-2.)  The parties' position on this issue is in accordance with governing law, given the undisputed evidence that Sisco was controlling Baucom's activities even though Pinnacle was nominally his employer.  *See generally Guidry v. South Louisiana Contractors, Inc.*, 614 F.2d 447, 452 (5th Cir. 1980) (observing that an employer-employee relationship is essential to recovery under the Jones Act, but that a third person who borrows a worker may become his employer if the third person assumes sufficient control over the worker, none of which may preclude the worker from remaining his immediate employer's

servant for Jones Act purposes, as well); *Reeves v. Mobile Dredging & Pumping Co.*, 26 F.3d 1247, 1253 (3rd Cir. 1994) (in Jones Act context, "[t]he existence an employment relationship ... turns on the degree of control the alleged employer exerts over the employee").  Therefore, after damages have been determined on the Jones Act cause of action *infra*, judgment will be entered on that cause of action against defendants Sisco and Pinnacle, jointly and severally.

>       **B.       *Unseaworthiness Cause of Action.***

In addition to his Jones Act claim, Baucom also advances a cause of action against Sisco for unseaworthiness.[28]

"A ship owner is strictly liable for personal injuries caused by his or her vessel's unseaworthiness.  A vessel is unseaworthy if the vessel and its appurtenances are not reasonably fit for their intended use."  *Taylor*, 517 F.3d at 383 (citation omitted); *see also Park*, 492 F.3d at 604 ("A vessel is unseaworthy only if it presents an unreasonable risk of harm to the seaman."). The touchstone of the unseaworthiness test is not whether the vessel is free from all risks of mishap or injury, but is rather whether the vessel is reasonably suited for the purpose or use for which it was intended.  *See Park*, 492 F.3d at 604.  Significantly, "liability for unseaworthiness does not require any showing of a defendant's negligence."  *Napier v. F/V DEESIE, Inc.*, 454 F.3d 61, 64 n.1 (1st Cir. 2006).  Rather, the unseaworthiness cause of action imposes strict liability on a ship owner to maintain the vessel in a reasonably fit condition.  "[E]ven a temporary and unforeseeable malfunction or failure of a piece of equipment is sufficient to establish an unseaworthy condition."  *Id.* at 68; *see also Perkins v. American Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 602 (6th Cir. 2001) (recognizing "well-settled law that even a temporary or unforeseeable failure of a piece of vessel equipment under proper and expected use is sufficient to establish unseaworthiness").

The Court readily concludes that there was an unseaworthy condition onboard the SISCO

---

[28]       A claim of unseaworthiness is legally distinct from one for Jones Act negligence. *See, e.g., Magnussen v. YAK, Inc.*, 73 F.3d 245, 249 (9th Cir. 1996) ("Just as liability for negligence is not limited to unseaworthiness conditions, so acts of negligence do not necessarily constitute unseaworthiness."); *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988) ("The owner's duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care.").  Therefore, Baucom's claim for unseaworthiness must be considered independently from his Jones Act claim.

I at the time of Baucom's accident on December 8, 2003.  Factual findings set forth *supra* reflect that there was a broken handrail on the vessel, and that a crane cable had become wrapped around that broken rail.  Sisco's own agent, Aaron Elliott, conceded at trial that a broken handrail is an unsafe condition, that it would be unsafe to operate the crane if a crane cable was wrapped around the handrail, and that such a condition would render the SISCO I unfit to perform its function of loading and unloading cargo.[29]  It is abundantly clear from the record that the crane cable wrapped around the handrail was a temporary malfunction establishing an unseaworthy condition onboard the SISCO I.  That Sisco may have been unaware that the cable was looped around the handrail is of no consequence.  Furthermore, while the undersigned is convinced that this unseaworthy condition was entirely foreseeable, given the track record of such occurrences when a handrail was broken on the SISCO I, whether Sisco could have foreseen such a condition is irrelevant for purposes of the unseaworthiness claim.  The SISCO I was unseaworthy at the moment when Baucom injured his back on December 8, 2003.

There being an unseaworthy condition, Sisco, as the vessel's owner, "is strictly liable for personal injuries caused by his or her vessel's unseaworthiness."  *Taylor*, 517 F.3d at 383 (citation omitted).  As for causation, the relaxed Jones Act standard does not apply to unseaworthiness claims.  *See McClow*, 842 F.2d at 1251; *Comeaux v. T.L. James & Co.*, 702

---

[29]     The relevant exchange was as follows:

"Q:     Would it be safe to operate the crane if one of the crane's cables was wrapped or looped around the handrail?
"A:     No, sir, it wouldn't.
"Q:     Would you agree that the crane couldn't function if one of the cables was wrapped around a handrail or looped around a handrail?
"A:     No, sir, it couldn't.
                    *                    *                    *
"Q:     Would you agree that a properly functioning crane is essential to the mission of the SISCO I, which is to unload and unload cargo (sic)?
"A:     Yes, sir."
                    *                    *                    *
"Q:     Would you agree that a closing line looped around a handrail would cause the vessel not to be fit to load and unload cargo?
"A:     Yes, sir, I would."

(Trial Transcript (doc. 143), at 47-48.)

F.2d 1023, 1024 (5ᵗʰ Cir. 1983) ("The standard required to prove causation as a result of the vessel's unseaworthiness is more demanding than that for recovery under the Jones Act, and requires proof of proximate causation in the traditional sense."). Thus, to establish causation in the unseaworthiness context, the plaintiff must demonstrate the unseaworthy condition to be the proximate cause of his injury. *See Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6ᵗʰ Cir. 2006). In this context, proximate cause means "the cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces the results complained of, and without which it would not have occurred." *Napier*, 454 F.3d at 68;[30] *see also Churchwell*, 444 F.3d at 904 ("A vessel's unseaworthiness is the proximate cause of a plaintiff's injuries if it was a substantial factor in causing such injuries."). Given Baucom's testimony that the onset of his complex of symptoms coincided with his injury attempting to correct the unseaworthy condition, the Court finds that the SISCO I's unseaworthiness was a substantial factor causing Baucom's injuries, such that the proximate causation standard is satisfied.

In their post-trial briefs, both Baucom and Sisco/Pinnacle agree that liability for the unseaworthiness claim must be confined to Sisco, and that Pinnacle cannot be liable on this cause of action because it did not own, charter or otherwise control the SISCO I. (*See* Plaintiff's Brief (doc. 145), at 2-3; Defendants' Brief (doc. 146), at 1-2.) Accordingly, after appropriate findings are made concerning damages, the Court will enter judgment in Baucom's favor and against Sisco on the unseaworthiness cause of action.

### C. *Exemplary Damages and Attorney's Fee Claims Related to Maintenance and Cure Obligations.*

As discussed *supra*, the lone component of plaintiff's maintenance and cure cause of action that remains in these proceedings is his claim for exemplary damages and attorney's fees arising from Pinnacle/Sisco's failure to pay certain maintenance and cure benefits. This claim is rooted in Dr. Revels' October 2006 deposition, wherein his recommendation of lumbar fusion surgery for Baucom became known to Pinnacle, as did Dr. Revels' opinion that to a reasonable

---

[30]     "An intervening cause is a new and independent cause of the harm which is neither anticipated nor reasonably foreseeable by the defendant: it must operate independently of and occur after the conclusion of the defendant's negligent conduct." *Id.*

degree of medical certainty the need for that surgery was ascribed to the December 2003 accident and not to the April 2005 accident. Plaintiff's position is that Pinnacle/Sisco should have promptly agreed to pay for that surgery upon learning of Dr. Revels' opinions and that their failure to do so prevented him from receiving that medically indicated procedure as of the date of trial. Baucom seeks exemplary damages and attorney's fees from Pinnacle/Sisco on this theory.

"If the shipowner, in failing to provide maintenance and cure, has been callous and recalcitrant ... or arbitrary or capricious ... reasonable attorney's fees may also be recovered." *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 375 (5th Cir. 1981); *see also Nichols v. Barwick*, 792 F.2d 1520, 1524 (11th Cir. 1986) ("Attorney's fees are available to a plaintiff when the defendant refuses to provide maintenance and cure in bad faith, callously, or unreasonably."). The same is true of exemplary damages. *See Flores v. Carnival Cruise Lines*, 47 F.3d 1120, 1127 (11th Cir. 1995) (to recover punitive damages in admiralty law, plaintiff must show that defendant exhibited willful and wanton misconduct); *Hines v. J.A. LaPorte, Inc.*, 820 F.2d 1187, 1188-90 (11th Cir. 1987) (explaining that both punitive damages and attorney's fees may be awarded in a case of arbitrary and willful withholding of maintenance and cure benefits). Thus, to receive an award of exemplary damages and attorney's fees on his claim related to Pinnacle/Sisco's failure to pay for the surgery, Baucom must establish that defendants' conduct in this regard was callous, willful, unreasonable, wanton, egregious or otherwise in bad faith.

Under the particularized circumstances of this case, it may well have been erroneous for defendants not to pay for Baucom's surgery, but it was not unreasonable, willful or egregious. *See generally Averett v. Diamond Offshore Drilling Services, Inc.*, 980 F. Supp. 855, 859 (E.D. La. 1997) (employer's failure to pay maintenance and cure, while erroneous, was not willful, wanton or egregious where employer's decision was based on a doctor's report, such that no attorney's fees were compensable). Pinnacle/Sisco paid maintenance and cure benefits (including more than $22,000 in weekly indemnity benefits, plus medical expenses) to Baucom from the time of the accident in December 2003 until May 19, 2004, when his treating physicians deemed him to be at maximum medical improvement and released him to return to work at full duty with no restrictions. There were sound legal and factual grounds for Pinnacle/Sisco to halt maintenance and cure benefits as of May 2004. *See Baucom v. Sisco Stevedoring, LLC*, 506 F. Supp.2d 1064, 1072 (S.D. Ala. 2007) ("The obligation to pay

-22-

maintenance and cure continues until such time as the seaman has reached the point of maximum cure."). Two and a half years later, plaintiff sought to reactivate defendants' maintenance and cure obligations by demanding that they pay for his back surgery. In the interim, Baucom had sustained another workplace accident for another employer that aggravated his underlying back injury and worsened his subjective complaints of pain. While Dr. Revels attributed the need for surgery to the December 2003 injury and not to the April 2005 injury, this opinion is confounded by his further testimony in October 2006 that he did not know whether Baucom would have required this surgery had the April 2005 injury not occurred.[31]

Based on these unusual circumstances, it was hardly unreasonable or egregious for Pinnacle/Sisco not to advance the $82,000 in surgery fees to Baucom in October 2006. Medical records confirmed that he had reached maximum medical improvement 30 months earlier, at which time Pinnacle/Sisco's maintenance and cure obligations abated. There had been another workplace accident involving another employer (Kinder Morgan) in the interim, such that Sisco/Pinnacle could reasonably have believed that Kinder Morgan was on the hook for any ensuing maintenance and cure that Baucom might be owed. The doctor who was recommending the surgery professed an inability to determine whether the surgery would have been needed had the intervening cause of the April 2005 accident never occurred, such that the medical testimony was not as cut and dried as plaintiff would have this Court find. Given this uncertainty as to whether Pinnacle/Sisco or someone else had a cure obligation to Baucom to pay for the surgery, the Court finds that defendants' refusal to pay for plaintiff's surgery from October 2006 through the date of trial was not callous, unreasonable or in bad faith. Judgment will be entered in defendants' favor on plaintiff's claim for exemplary damages and attorney's fees arising from

---

[31]    The critical exchange on this point is as follows:

"Q:    Is it more likely than not that Mr. Baucom would not have needed surgery without having this new new accident on April 21st 2005?

A:    There's no way to know."

(Plaintiff's Exh. 17 (Oct. 2006 dep.), at 19.) Dr. Revels reiterated this opinion in his September 2007 deposition. When asked whether it was more likely than not that Baucom would have required surgery had the April 2005 accident never occurred, Dr. Revels responded, "There's no way to answer. It's unknown. It's possible. But that's all I can say." (Plaintiff's Exh. 17 (Sept. 2007 dep.), at 48.)

defendants' failure to pay certain maintenance and cure benefits.

      **D.**      ***Damages.***

      Having found that Pinnacle/Sisco are liable on the Jones Act negligence cause of action, and that Sisco is liable on the unseaworthiness claim, all that remains is the computation of damages. Plaintiff seeks two categories of damages in connection with these claims, to-wit: past and future earnings, and pain and suffering. The Court now considers those aspects of damages, as well as potential upward and downward adjustments to same.

      *1.*      *Past and Future Earnings.*[32]

            *a.*      *Back Wages.*

      There is no dispute between the parties that lost wages (past and future) are a proper category of damages in cases under the Jones Act and for unseaworthiness under the general maritime law. *See generally Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 361 (3rd Cir. 1998) (compensatory damages for loss of future earning capacity are available in Jones Act cases); *Vickers v. Tumey*, 290 F.2d 426, 434 (5th Cir. 1961) ("in a seaman's action either under the Jones Act or maritime doctrine of unseaworthiness, a part of the recovery, if otherwise permissible, will be the loss of wages from the date of the injury down to the trial and, if established, the probable loss of wages in the future").

      Clearly, no lost wages are due for the period of December 8, 2003 (the date of the SISCO I accident) through May 19, 2004 (the date on which Dr. Patton released Baucom to return to work). During that time period, Pinnacle was paying Baucom weekly benefits in excess of $1,000, which surely included his foregone earnings. Presumably in recognition of that fact, plaintiff has not requested back pay for this interval. Nor does Baucom seek a lost wages award for the period from May 19, 2004 through April 21, 2005 (the date of the Kinder Morgan

---

[32]      One issue that the Court directed the parties to address in their post-trial briefs concerned the proper calculations of lost wages (past and future) for the Jones Act and unseaworthiness causes of action. In response, the parties summarized the testimony and opinions of their respective experts concerning computation methods; however, neither of them devoted any attention to the impact of the Kinder Morgan settlement or past payments by Kinder Morgan or Pinnacle on any lost wages recovery. Certainly, defendants have not claimed any right to offset any of those payments against the past and future lost wages claimed by Baucom here.

accident), during which time he was cleared to work full-time without restrictions.  Plaintiff does request, however, an award of lost wages from April 2005 through the trial date, a figure that his expert economist, Dr. Rice, calculated as being $117,588, after backing out tax liability and business expenses.  Sisco/Pinnacle's economist, Dr. Boudreaux, offered a competing calculation of $98,036.17.[33]  The sole difference in such calculations appears to be the differing wage base utilized by the two experts in their computations.  As stated *supra*, the Court finds that the wage base proffered by Dr. Boudreaux more accurately captures Baucom's widely fluctuating earnings history from year to year, even when he was 100% healthy, and quite properly takes into account Baucom's tendency to take off from work several months each year to pursue hobbies such as hunting and fishing.  Accordingly, plaintiff's after-tax, after-business expense lost wages for the period of April 21, 2005 through trial are valued at **$98,036.17**.[34]

---

[33]   This $98,036.17 figure is drawn both from Dr. Boudreaux's testimony at trial and from his report, which is found at Defendant's Exhibit 29.  Confusingly, Defendant's Exhibit 53 is a supplemental table that, *inter alia*, recalculates the past loss figure at $97,748.05.  There appears to be no record explanation for the approximately $300 difference in such calculations, and the Court will not give defendants the benefit of the lower number in the absence of any explanation or basis for doing so.

[34]   A potential complication in this back-pay award lies in the undisputed fact that Kinder Morgan paid longshoreman's compensation to Baucom from the April 2005 accident through October 2006, and has also recently agreed to restore maintenance and cure benefits to Baucom through the date of trial and beyond.  Indeed, plaintiff's counsel apprised the Court at trial that "[w]e've entered into an agreement that Kinder Morgan is paying the past due maintenance and cure which we would argue is rightfully owed by Pinnacle, but we're not attempting to recover that from Pinnacle."  (Trial Transcript (doc. 143), at 9.)  Of course, "it is settled law that wages is a basic component of an award of maintenance and cure."  *Flores v. Carnival Cruise Lines*, 47 F.3d 1120, 1122 (11th Cir. 1995) (citation omitted).  Be that as it may, and despite being ordered to brief wage calculation issues after trial, defendants have never suggested that awarding back pay or future pay to Baucom in these circumstances would constitute a double recovery or that they are entitled to an offset of Kinder Morgan payments against any such award.  Any such argument would fail anyway, pursuant to application of the collateral source rule, which "provides that compensation from a collateral source should be disregarded in assessing tort damages."  *Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 741 (4th Cir. 2000); *see also Bourque v. Diamond M. Drilling Co.*, 623 F.2d 351, 354 n.2 (5th Cir. 1980) ("The collateral source rule is applicable to suits brought under the Jones Act."); *Blige v. M/V GEECHEE GIRL*, 180 F. Supp.2d 1349, 1357 (S.D. Ga. 2001) (following *Chisholm* and *Bourque*).  More to the point, the Court observes that any such offset would run afoul of the rule

From a causation standpoint, the Court finds that defendants' negligence on December 8, 2003, and the resulting back injury to Baucom, played a part in bringing about plaintiff's lost earnings for the period of April 21, 2005 through trial.  Therefore, those lost past wages are properly awarded to plaintiff on his Jones Act negligence claim.  The Court does not find, however, that the higher proximate causation standard required for Baucom's unseaworthiness claim is met with respect to these lost wages.  Simply put, plaintiff has failed to show by a preponderance of the evidence that he would have been unable to work full-time as a crane operator from April 2005 through trial were it not for the intervening cause of the April 2005 injury at Kinder Morgan.  He had been working full-time in that occupation for nearly a year before that April 2005 injury, and there is no indication that he would have been unable to continue in that capacity had the Kinder Morgan accident never occurred; therefore, with respect to the unseaworthiness claim, the Court is of the opinion that the April 2005 accident was an intervening cause that broke the chain of causation between the December 2003 injury and plaintiff's lost wages from April 2005 through trial.  Accordingly, no back wages will be awarded as to the unseaworthiness cause of action.

*b.* *Future Wages.*

Based on the expert calculations of Dr. Rice, submitted on an after-tax, discounted-to-present-value basis, plaintiff requests lost future earnings of $394,085, to compensate him for lost earnings from the date of trial all the way through the end of his expected work life.  To facilitate the analysis, the Court will divide the future earnings claim into two temporal periods: (a) from the date of trial through maximum medical improvement post-surgery; and (b) from maximum medical improvement through the end of Baucom's working life.

Baucom claims lost future earnings from now until he reaches maximum medical improvement following the contemplated lumbar fusion surgery to be performed by Dr. Revels.  The record is clear that he remains medically restricted from all work activity pending the conclusion and recuperation from such surgery, and that such work restrictions were caused in part by defendants' negligence in December 2003, so as to satisfy the relaxed Jones Act

---

that "maintenance pay may not be deducted from an award for past lost wages."  *Phillips v. Western Co. of North America*, 953 F.2d 923, 929 (5th Cir. 1992).

causation standard.[35]  Therefore, future wages are properly compensable to Baucom on the Jones Act claim for the period of time running from trial through his recuperation from surgery.  Dr. Revels estimated the recovery period from surgery as being only a few months.  The problem here is that plaintiff has introduced no evidence establishing when this surgery might reasonably occur.  The information before the Court is that all financial obstacles to Baucom undergoing back surgery were lifted in January 2008, with the Kinder Morgan settlement.  Plaintiff proffered no evidence explaining why that surgery could not be performed promptly as of January 2008, or why he had not received it as of the mid-February 2008 trial date.  On this record, it appears that, had he pursued the matter with reasonable diligence, Baucom might have had this back surgery before or shortly after trial.  He cannot delay that surgery indefinitely, or drag his feet in scheduling the surgery, and expect Pinnacle/Sisco to continue paying his lost wages all the while.  Combining that observation with the "few months" of recuperation cited by Dr. Revels, the Court finds that an award of future lost earnings for six months is appropriate to compensate Baucom for his inability to work from the date of trial through the projected date of maximum medical improvement at the conclusion of his recuperation period from surgery, assuming he obtains the surgery reasonably promptly.  Given the annual wage base of $44,788, six months of lost earnings would equate to half that amount, or $22,394.  After reasonable deductions for taxes and discounting to present value pursuant to *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) ("*Culver II*") (as both parties agree is appropriate), the future lost earnings awarded for the period of time encompassing plaintiff's surgery and post-surgery recuperation total **$17,915.20**.

    With respect to the period running from the conclusion of Baucom's surgery recuperation

---

[35]    For the reasons stated in the previous subsection, the Court finds that plaintiff has not satisfied his burden of showing that his lost earnings for this period of time are proximately caused by the unseaworthiness of the SISCO I, given the intervening cause of the April 2005 accident that is preventing Baucom from being able to engage in full-time work at his usual and customary occupation during this time.  Dr. Revels' testimony establishes that, while the purpose of the surgery is to correct the symptoms initially brought on by December 2003 injury, it is impossible to know whether such surgery would have been medically indicated in the absence of the intervening cause of the April 2005 accident at Kinder Morgan.  Plaintiff having failed to establish proximate causation, these future lost wages will not be awarded as to the unseaworthiness claim, but will instead be confined to the Jones Act cause of action.

through the end of his working life, there is a failure of proof of a different kind.  The record includes the testimony and reports of two dueling economists and two dueling vocational rehabilitation experts as to Baucom's post-surgery job prospects and earnings potential.  This evidence is largely unhelpful because it is all predicated on assumptions concerning plaintiff's post-surgical functional capacity and ability to work.  Those assumptions have no basis in any facts in evidence.  Indeed, the only record evidence (aside from hearsay testimony of Baucom as to what Dr. Revels allegedly told him, which this Court has discounted) of the likely results of the proposed surgery is the following exchange from the deposition of the surgeon himself:

> "Q:    Okay.  Can you at this time state whether or not he would be able to work
>        as a crane operator again?
> "A:    I do not know.
> "Q:    You do not know that he would not be able to also.  Correct?
> "A:    Correct."

(Plaintiff's Exh. 17 (Sept. 2007 dep.), at 39.)[36]

Despite all of the economic, vocational and medical evidence in the record, then, the inescapable truth of the matter is that no one knows whether Baucom will be able to work after his surgery and, if so, to what extent or in what capacity.  It is entirely possible that Baucom will be able to resume work as a crane operator on a full-time basis with no restrictions after he recovers from surgery.  It is also possible that Baucom will not be able to return to work at all for the remainder of his working life.  Between these extremes lie numerous other alternatives.  There is absolutely no basis in the record for assigning any sort of probability to this broad continuum of potential outcomes.  Eschewing any briefing on the subject in their post-trial submissions (despite being expressly directed to cover same), both parties simply throw the matter in the Court's lap, essentially saying, "Here's the range of possibilities, Judge.  Pick the one you like the best."  This Court could make a guess that Baucom will be able to go back to work as a crane operator.  This Court could make a guess that he will be confined to sedentary

---

[36]    This unorthodox form of citation is necessitated by the fact that plaintiff submitted two different deposition transcripts for Dr. Revels under the same exhibit number.  Therefore, the additional notation in the cite form is needed to distinguish between the October 2006 and September 2007 deposition transcripts, to both of which plaintiff assigned the same exhibit number.

work as a dispatcher or escort vehicle driver, or that he will be able to work light duty as a delivery driver or courier. This Court could make a guess that the surgery will fail and that Baucom will be permanently disabled and unable to work for the rest of his life. But the central point is this: Each of these scenarios would be sheer speculation by the Court, untethered from any evidentiary foundation. Plaintiff has proffered no proof, expert or lay, from which the Court might be able to assign probabilities to these different possible outcomes, or otherwise to make factual findings as to their relative likelihood.

All of this uncertainty poses a formidable obstacle to plaintiff's quest to recover for future lost earnings. After all, "tort law requires an aggrieved plaintiff to prove its damages with a reasonable degree of certainty." *Guyana Tel. & Tel. Co. v. Melbourne Int'l Communications, Ltd.*, 329 F.3d 1241, 1248 (11th Cir. 2003). "[D]amages may not be determined by mere speculation or guess." *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001); *see generally Systrends, Inc. v. Group 8760, LLC*, 959 So.2d 1052, 1076 (Ala. 2006) ("It is true that damages may be awarded only where they are reasonably certain. Damages may not be based upon speculation.") (citation omitted). Yet plaintiff would have this Court engage in just such speculation or guesswork to compute future lost earnings, where Baucom's future earning capacity is unknown and unknowable because of his pending back surgery. The Court declines plaintiff's invitation to engage in a *de facto* coin-flipping, palm-reading, fortune-telling enterprise as to what plaintiff's functional capabilities will be following recuperation from surgery, where the evidence will not allow even reasonable inferences to be drawn as to whether and to what extent plaintiff will be able to work in the future.[37] Plaintiff having failed to prove

---

[37]    Plaintiff's only rejoinder to the obviously speculative nature of his request for future lost earnings is to argue that "Sisco/Pinnacle surely have no one to blame but themselves for plaintiff's present predicament, and they should not be allowed to benefit from any assumption that plaintiff will get a good result from his pending surgery, when it is they who have denied him the benefit of this needed surgery." (Doc. 145, at 25.) This argument fails for two reasons. First, there has been no finding by this Court or any other that Sisco/Pinnacle was legally obligated to pay for Baucom's back surgery. As plaintiff is well aware, ultimately Kinder Morgan agreed to fund that surgery. It is unclear to this Court how Sisco/Pinnacle are at fault for Kinder Morgan's delay in entering into such an agreement. Second, and more fundamentally, plaintiff cannot cavalierly shrug off his burden of proving damages by passing the buck to defendants. At the end of the day, it is plaintiff's sole responsibility to prove up his

any future lost wages post-recuperation from surgery to a degree even approaching reasonable certainty, he will not receive an award for this category of damages.

> 2.    *Pain and Suffering / Non-Economic Damages.*

The second major category of damages in play in this case is that of pain and suffering. In the presence of uncontradicted evidence of pain and suffering, a plaintiff bringing a claim in admiralty is entitled to a general damages award. *See Levesque v. Marine Drilling Co.*, 783 F. Supp. 302, 308 (E.D. Tex. 1992) (ordering new trial on damages where jury awarded plaintiff special damages for medical expenses and lost wages without awarding general damages for pain and suffering, where uncontroverted record evidence showed that plaintiff suffered pain from injury and underwent an operation). The Court finds that an award of general damages is appropriate here to compensate Baucom for the pain and suffering he has incurred as a result of defendants' negligence and the unseaworthy condition of the SISCO I on December 8, 2003. The question is how large that award should be. Baucom requests a pain and suffering award of $500,000 or greater, while defendants peg what they contend to be a more reasonable figure at an amount somewhere between $10,000 and $150,000.

"Awards of pain and suffering are fact-specific and depend to a great extent on the fact-finder's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation." *Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776, 783 (5th Cir. 1986). Although the fixing of damages for pain and suffering is necessarily a highly subjective plaintiff-specific exercise, rendering comparisons to awards in other cases of limited value, the Court's research has disclosed numerous instances where a plaintiff was awarded substantially less in general damages for pain and suffering than Baucom seeks here, despite similar or even more serious physical injuries.[38] The Court derives "rough guidance" from these past awards.

---

damages with reasonable certainty. Baucom having failed to do so, he cannot expect this Court to indulge a speculative assumption that his surgery will not bring about a good result.

[38]    *See generally Gautreaux*, 84 F.3d at 783 (affirming award of $300,000 for pain and suffering where plaintiff "has undergone three surgeries, had his eyeball scooped out, is forced to wear a prosthetic eye which must be removed for cleaning frequently, and must endure both functional and cosmetic disabilities for the rest of his life"); *Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501 (5th Cir. 1989) (where plaintiff suffered lower neck injury on offshore

*Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501, 506 (5th Cir. 1989)

After careful consideration of the evidence presented at trial, and after due consideration of the compensatory purposes and objectives of a general damages award, the Court finds that an appropriate award for pain and suffering (physical and mental) attributable to defendants' negligence and the unseaworthy condition of the SISCO I is $125,000, of which $85,000 is allocated for past pain and suffering and $40,000 is allocated for future pain and suffering. In reaching this determination, the Court relies on a number of observations. First, although Baucom was out of work for five months after the December 2003 incident, no permanent disability impairment rating was attached to that injury. He was released to work with no restrictions of any kind, and passed multiple work-related physical examinations, within months after the SISCO I injury occurred. Second, while there is no question that Baucom experienced substantial discomfort (and sometimes outright agony) during that five-month period, his own testimony established that it was not constant unbearable pain; rather, he was able to minimize his discomfort through pain medication and reduction of his physical exertion level. Third, there is minimal evidence in the record of how Baucom's injury has affected his everyday life. The Court understands that Baucom is at least temporarily unable to work and that he experiences bouts of significant pain, but the record is devoid of evidence as to what functional limitations Baucom experiences in his day-to-day affairs and daily life activities. Fourth, although plaintiff is correct that there is some evidence that he was referred to a mental health professional for treatment after his back injury, the record is undeveloped as to the nature of that treatment or any

---

platform, such that he was in a partially disabled state, the maximum appropriate award for pain and suffering was $200,000); *Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110 (5th Cir. 1984) (affirming award of approximately $180,000 for pain and suffering where plaintiff suffered from herniated lumbar disc, had 10 to 15% permanent disability rating, and suffered ongoing depression); *Falconer v. Penn Maritime, Inc.*, 421 F. Supp.2d 190 (D. Me. 2006) (canvassing case law for pain and suffering awards ranging from nominal amounts to millions of dollars, and deeming jury's $100,000 pain and suffering award adequate where plaintiff fell into open hatch on tugboat and sustained basal skull fracture, spinal fracture, pulmonary problems, and the like, and is permanently paralyzed in his mid to lower body); *Sanford v. Kostmayer Const. Co.*, 891 F. Supp. 1201 (E.D. La. 1995) (jury awarded $250,000 for past and future physical pain and suffering where plaintiff received an anatomical disability rating of 15 to 20% as a whole, following surgery).

diagnoses resulting from same.  Fifth, while the Court understands that plaintiff experiences excruciating pain now, and was obviously in considerable distress even as he testified from the witness stand at trial, that discomfort is attributable in substantial part to the intervening cause of the April 2005 accident.  There is no reason to believe that plaintiff's pain levels would be nearly as pronounced as they are today had that April 2005 accident at Kinder Morgan not occurred.  It would be unfair and inappropriate to hold Sisco/Pinnacle responsible for Baucom's pain and suffering arising from the Kinder Morgan accident.  Taken in the aggregate, these factors convince the Court that plaintiff's requested $500,000 figure for pain and suffering damages is unreasonable and grossly excessive, given the particularized circumstances of this case.

On the other hand, defendants' attempts to minimize the pain and suffering award to a number in the low five figures are unpersuasive, as well.  Contrary to defendants' assertion that Baucom's medical problems related to the December 2003 injury had been fully resolved as of the April 2005 injury, Dr. Revels' testimony is quite clear that the underlying anatomical problem was the same, and that the April 2005 incident merely aggravated the subjective symptoms arising from that anatomical problem.  For that reason, Sisco/Pinnacle are not absolved of legal responsibility for the pain and suffering that Baucom experienced after the April 2005 accident, that he experiences today, and that he will experience in the future, at least until he recovers from surgery months from now.  Those problems all stem from the December 2003 injury, albeit with the additional aggravator of the April 2005 accident for which Sisco/Pinnacle is obviously not responsible.  Therefore, the Court cannot agree with Sisco/Pinnacle's argument that all responsibility for pain and suffering post-April 2005 should be shifted to Kinder Morgan.  It was the December 2003 accident (caused by defendants' negligence and the unseaworthy condition of the SISCO I) that created the underlying symptoms from which Baucom is suffering today; therefore, defendants' suggestion that a general damages award of $10,000 to $18,000 would be appropriate strikes the Court as unreasonable and inadequate.

For all of the foregoing reasons, it is the determination of this Court that a reasonable award to compensate Baucom for pain and suffering arising from defendants' negligence and the SISCO I's unseaworthiness is one-quarter of the $500,000 figure he claims.  Accordingly,

plaintiff will be awarded an amount for pain and suffering in the amount of **$125,000**.[39]

> 3.      *Comparative Negligence Defense.*

In the Joint Pretrial Document (doc. 112), Sisco/Pinnacle asserted the affirmative defense of comparative negligence.  "It is well established that comparative negligence applies to unseaworthiness claims as well as Jones Act claims."  *Churchwell*, 444 F.3d at 908.  The comparative negligence defense exists if there is "evidence that the seaman chose to perform a task in a manner that placed him in danger despite the fact that there were alternative means available to him."  *Id.* (citation omitted).  In that event, "the plaintiff's damages are reduced by the degree of fault that the [finder of fact] assigns to plaintiff's behavior."  *Id.* "Courts apply the doctrine of comparative fault to encourage reasonable care by seamen while at the same time placing a high degree of responsibility on owners for the unseaworthiness and safety of their vessels and appliances."  *Simeonoff v. Hiner*, 249 F.3d 883, 889 (9th Cir. 2001).  "The standard of care for a Jones Act seaman is to act as an ordinarily prudent seaman would act in like circumstances."  *Jackson v. OMI Corp.*, 245 F.3d 525, 528 (5th Cir. 2001).  In applying this defense, the Court bears in mind that, notwithstanding a seaman's duty to use reasonable care, "[g]enerally, a seaman has no duty to find the safest way to perform his work."  *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1355 (5th Cir. 1988).

Defendants never fleshed out this defense either at trial or in their post-trial briefing; therefore, it is difficult to discern precisely what their argument is.  It is apparently their contention that any damages award to Baucom should be reduced proportionally because he is partially at fault for the December 2003 accident.  The Court disagrees, and specifically finds that Baucom was not negligent in his handling of the tangled cable / broken handrail problem onboard the SISCO I.  A reasonably prudent seaman in Baucom's position who observed the

---

[39]      To be clear, there is no need to apportion this figure between Sisco/Pinnacle and Kinder Morgan.  In reaching the determination of the proper general damages award in this case, the Court has focused specifically on plaintiff's pain and suffering which is attributable to Sisco and Pinnacle's negligence and the unseaworthiness of the SISCO I.  It would therefore be inappropriate to reduce that figure further based on some percentage-based allocation of plaintiff's pain and suffering between Sisco/Pinnacle and Kinder Morgan, inasmuch as the award in this case captures only that aspect of plaintiffs' pain and suffering for which Sisco/Pinnacle should be held responsible.

crane cable wrapped around a broken handrail would have stopped working, boomed down the crane, walked out on the catwalk, and attempted manually to free the cable. That is precisely what Baucom did, and the Court finds nothing unreasonable, unsafe, or negligent in Baucom's conduct in this regard.[40] To the extent that defendants would ascribe error to Baucom's failure to attempt to free the cable by manipulating the levers and pedals of the crane (as Allemand had done when confronted with a similar hazard), the uncontroverted testimony was that such a method would not have resolved the problem in this instance because of the manner in which the cable was caught. Finally, to the extent that defendants would ascribe negligence to Baucom's failure to observe and report the broken handrail in his daily inspections of the crane boom, this Court has already made findings that Baucom had in fact observed the broken handrail and reported it to the appropriate Sisco/Pinnacle representative days, if not weeks, before the accident occurred. He was not negligent in that regard.

In short, it is the finding of this Court that defendants have failed to prove their affirmative defense that Baucom was comparatively negligent; therefore, the damages award in this case will not be reduced proportionately.

                **4.**     *Prejudgment Interest.*

"Courts have generally recognized that the award of prejudgment interest may be appropriate in Jones Act cases tried in admiralty." *Jauch v. Nautical Services, Inc.*, 470 F.3d 207, 215 (5th Cir. 2006). Indeed, "[i]n personal injury cases under admiralty jurisdiction, prejudgment interest must be granted unless peculiar circumstances justify its denial." *Simeonoff*, 249 F.3d at 894 (citation omitted). Such prejudgment interest awards apply even to general damages awards for pain and suffering, rather than being confined to special damages for liquidated amounts. *See Couch v. Cro-Marine Transport, Inc.*, 44 F.3d 319, 327-28 (5th Cir. 1995).

---

[40]      There was some suggestion by defendants at trial that Baucom should have called for assistance of other SISCO I crew members rather than attempting to free the cable himself. Certainly, the trial testimony establishes that Baucom could have solicited the aid of the deckhands or lead operator; however, he had no reason to do so, because it was not apparent to him that pulling on the cable would be unsafe or pose a substantial risk to his well-being. It was not objectively unsafe or unreasonable for him to attempt that maneuver on his own; therefore, no negligence can be ascribed to his failure to call for help.

Unfortunately, while plaintiff has requested an award of pretrial interest in the joint pretrial document, no party has made any suggestion, much less proffered any argument, as to what the appropriate rate of interest should be, or the starting date on which it should accrue. The Eleventh Circuit has declared, however, that in admiralty cases "[t]he rate of pre-judgment interest that should be awarded is the prime rate during the relevant period." *Sunderland Marine Mut. Ins. Co. v. Weeks Marine Const. Co.*, 338 F.3d 1276, 1280 (11th Cir. 2003). Taking the average of the prime rate from December 1 on each of the last five calendar years, the Court computes the average prime rate during the relevant period as 6.35%.[41] Pursuant to *Sunderland*, that rate of interest will be applied here. Interest will be compounded annually from the date of December 8, 2003 until the date of judgment. Of course, this prejudgment interest applies only to the portion of the general damages award for past pain and suffering and the award of past lost wages, not for any future pain and suffering or future lost wages. *See Couch*, 44 F.3d at 328 ("Prejudgment interest, however, may not be awarded with respect to future damages."). The Court has allocated the $125,000 pain and suffering award such that $85,000 is for past pain and suffering, while $40,000 is for future pain and suffering; therefore, prejudgment interest is owed only on $85,000 of the general damages award. Performing that calculation, the total prejudgment interest due on the $85,000 award for past pain and suffering is **$26,545.81**.[42] Using the same interest rate and methodology, the prejudgment interest due on the award of $98,036.17 in past lost wages running from April 2005 through the date of judgment is

---

[41] In particular, the Court's research reflects that the prime rate on December 1 from each of the last five years was (in order from 2003 to 2007) 4.00%, 5.00%, 7.00%, 8.25%, and 7.50%. A simple average of those five figures is 6.35%. In the absence of any guidance or suggestion by the parties as to how the prejudgment interest rate should be calculated or what that rate should be, the Court will apply this average figure.

[42] This figure was computed by multiplying the $85,000 original figure by 1.0635 to obtain the total balance of principal and interest on December 8, 2004; then multiplying that new figure by 1.0635 to obtain the total balance on December 8, 2005; and so on, through December 8, 2007, for a total balance of principal and interest at that time of $108,734.89. Using that same 6.35% interest rate, the daily interest owed on that balance for the year beginning December 8, 2007 would be $18.87 ($108,734.89 x .0635 / 366 days). Multiplying that $18.87 figure through the date of judgment (149 days) adds $2,810.92 in interest to the total, for a final balance of $111,545.81, of which $85,000 is principal and $26,545.81 is prejudgment interest.

**$19,886.91**.

## IV.    Conclusion.

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.      The Court finds in favor of the plaintiff, Robert Baucom, and against the defendants, Sisco Stevedoring, LLC and Pinnacle Management, on plaintiff's claim of Jones Act negligence.

2.      The Court further finds in favor of the plaintiff, Robert Baucom, and against defendant Sisco Stevedoring, LLC on plaintiff's claim of unseaworthiness.

3.      Judgment will be entered against both defendants, jointly and severally, on the Jones Act negligence claim in the amount of **$287,384.09**, such amount to include $85,000 for past physical and mental pain and suffering, $26,545.81 in prejudgment interest, $40,000 for future pain and suffering, $98,036.17 for past lost earnings, $19,886.91 for interest on past lost earnings, and $17,915.20 for future lost earnings through plaintiff's recuperation from surgery.

4.      The Court also finds that plaintiff is entitled to damages from defendant Sisco on the unseaworthiness cause of action in the amount of **$151,545.81**, including $85,000 for past physical and mental pain and suffering, $26,545.81 in prejudgment interest, and $40,000 for future pain and suffering.  These findings do not impose new or cumulative obligations on Sisco, but rather are entirely overlapping, and subsumed within, the joint and several liability award on the Jones Act negligence cause of action; therefore, the judgment will not recite this finding as a separate or distinct obligation of Sisco.

5.      The Court finds in favor of the defendants and against plaintiff on plaintiff's claim for exemplary damages and attorney's fees relating to defendants' allegedly bad-faith denial of maintenance and cure benefits.

**DONE** and **ORDERED** this 5th day of May, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

-36-